# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

AISHAH SHAFIQ

VERSUS

OCHSNER HEALTH SYSTEM ET AL.

CIVIL ACTION

No. 18-8666

SECTION I

## ORDER & REASONS

Before the Court is defendants Ochsner Clinic Foundation ("Ochsner"), dba Ochsner Clinical School, ("OCS") and University of Queensland's ("UQ") (together, "defendants") motion[1] to dismiss plaintiff Aishah Shafiq's ("Shafiq") amended complaint. Shafiq opposes the motion.[2] In her response, Shafiq requests leave to amend her complaint in the event that the Court grants any part of defendants' motion to dismiss.[3] For the following reasons, defendants' motion to dismiss is granted in part and denied in part. Shafiq's request for leave to file another amended complaint is denied.

After defendants filed their motion to dismiss and Shafiq filed her response, the Court granted Shafiq's unopposed motion for leave to file a second amended complaint.[4] After Shafiq filed her second amended complaint,[5] defendants filed a reply in support of their motion to dismiss,[6] asserting that Shafiq still has not alleged

---

[1] R. Doc. No. 21.
[2] R. Doc. No. 26.
[3] R. Doc. No. 26, at 17.
[4] R. Doc. Nos. 25, 27.
[5] R. Doc. No. 28.
[6] R. Doc. No. 32.

facts in her second amended complaint sufficient to warrant relief. The Court, therefore, considers defendants' motion to dismiss as a motion to dismiss the second amended complaint.

## I.

Accepting all of the facts in Shafiq's second amended complaint as true, they are as follows:

In 2009, UQ and Ochsner partnered to form the UQ Ochsner Clinical School ("UQ-OCS") to provide UQ students international experience, educate U.S. medical students, and help increase physician recruitment at Ochsner.[7] Shafiq was a student of the UQ-OCS Doctor of Medicine program.[8] Students of the UQ-OCS program complete a four-year medical degree program; the first two, pre-clinical years are spent in Australia and the final two clinical years are spent in New Orleans.[9] Shafiq enrolled as an international student at UQ-OCS in 2013.[10]

Shafiq's first year of medical school was "disappointing," but she was permitted to repeat her first year and complete her second year at UQ in Australia. Shafiq then came to OCS in New Orleans to begin her third and fourth year clinical rotations.[11]

---

[7] R. Doc. No. 28, at 1, 3 ¶ 10.
[8] R. Doc. No. 28, at 1, 3 ¶ 9.
[9] R. Doc. No. 28, at 1, 4 ¶ 14
[10] R. Doc. No. 28, at 4 ¶ 15. Shafiq holds a dual citizenship in the United States of America and the Federation of Malaysia. *See id.* at 2 ¶ 1.
[11] R. Doc. No. 28, at 4–5 ¶ 16.

The United States Medical Licensing Examination ("USMLE") was scheduled during Shafiq's fifth rotation during her third year in the UQ-OCS program.[12] Shafiq delayed sitting for the USMLE during her fifth rotation because she was concerned that exam preparation would negatively impact her performance in the program; she was also unsure whether she wanted to match with a residency in the United States.[13] "Ignor[ing] her concerns," UQ-OCS faculty advised Shafiq that she had to sit for the USMLE if she wanted to be matched with a residency after graduation.[14] Although worried about the impact that exam preparation would have on her clinical performance, she nevertheless followed the faculty's advice "and attempted to juggle the demands of completing her clinical studies, twelve-hour shifts, and studying for the USMLE," which she took a few weeks after her fifth rotation ended.[15] The pressure of meeting these demands ultimately had a negative impact on Shafiq's mental and physical health.[16]

Shafiq might have been able to successfully navigate these challenges, however, if not for her housemate and fellow UQ-OCS student's ("H.B.") mental health issues.[17] The UQ-OCS faculty knew about H.B.'s ongoing mental health issues.[18] Shafiq was forced to care for H.B. as her mental health deteriorated, which

---

[12] R. Doc. No. 28, at 5 ¶ 18. Counsel for Shafiq explained to the Court that the USMLE is offered many times throughout the year.
[13] R. Doc. No. 28, at 5 ¶ 17.
[14] R. Doc. No. 28, at 5 ¶ 18.
[15] R. Doc. No. 28, at 5 ¶ 19.
[16] R. Doc. No. 28, at 5 ¶ 20.
[17] R. Doc. No. 28, at 5 ¶ 21.
[18] R. Doc. No. 28, at 5 ¶ 22.

impacted Shafiq's own stress and mental health.[19]  The night before Shafiq's fifth rotation final exams, H.B. suffered a complete mental break, requiring her to be hospitalized.[20]

At 6:00 a.m. on the day of her final exams, Shafiq alerted UQ-OCS administrator Scott Peters ("Peters") to H.B.'s hospitalization, which prevented Shafiq from sleeping or studying during the preceding eighteen hours.[21]  Shafiq asked Peters if she could postpone the multiple choice portion of her exam.[22]  Peters responded by providing Shafiq with "links" whereby she could postpone her exam, and although he agreed that the circumstances interfered with her ability to study, and he supported her request to defer her multiple choice exam, Peters "did not advise her of any additional options, such as the option of withdrawing from the course without academic penalty" or deferring her oral examinations.[23]  Shafiq, thereafter, "in her traumatized and sleep-deprived state," deferred her multiple choice exam but proceeded with her oral exam, which she failed.[24]

Shafiq appealed her failing grade in order to avoid expulsion from the program.[25]  Shafiq met with Associate Professor G. Dodd Denton, MD ("Dr. Denton"), Deputy Head of OCS, and Melissa Johnson, Senior Clinical Education Administrator,

---

[19] R. Doc. No. 28, at 6 ¶ 23.
[20] R. Doc. No. 28, at 6 ¶ 23.
[21] R. Doc. No. 28, at 6 ¶ 26.
[22] R. Doc. No. 28, at 6 ¶¶ 25–26.
[23] R. Doc. No. 28, at 6 ¶¶ 27–28.
[24] R. Doc. No. 28, at 7 ¶ 29.
[25] R. Doc. No. 28, at 7 ¶ 30.

on December 15, 2016.[26]  Dr. Denton informed Shafiq that she would receive a refusal of enrollment because she failed her obstetrics and gynecology course due to her performance on the oral exam.[27]  Dr. Denton outlined the appeals process and discussed Shafiq's career path, but he was unclear about whether the UQ-OCS faculty would support Shafiq's appeal.[28]

As she was preparing her appeal, Shafiq met with Associate Professor Leonardo Seoane, MD ("Dr. Seoane"), Head of OCS.  Despite knowing about the stress Shafiq was under at the time of her exam, Dr. Seoane did not inform Shafiq about counseling services.[29]  Dr. Seoane told Shafiq not to pursue her appeal because it was futile and she was wasting their time.[30]  Shafiq nevertheless pursued her appeal and submitted it to Professor Robyn Ward ("Professor Ward"), the Acting Dean of the Faculty of Medicine.[31]  Shafiq completed her first rotation of her final year, around March 2017, while her appeal was pending.[32]

Only 48 hours before the final exams for her second rotation of her final year, in May 2017, Shafiq learned that Professor Ward denied her appeal.[33]  On May 5, 2017, the day before Shafiq's final exams, Dr. Seoane called Shafiq into his office, berated her for pursuing her appeal, and told her to "stop pretending to be a medical

---

[26] R. Doc. No. 28, at 7 ¶ 31.
[27] R. Doc. No. 28, at 7 ¶ 32.
[28] R. Doc. No. 28, at 7 ¶ 32.
[29] R. Doc. No. 28, at 7 ¶ 33.
[30] R. Doc. No. 28, at 7 ¶ 33.
[31] R. Doc. No. 28, at 7 ¶ 34.
[32] R. Doc. No. 28, at 8 ¶ 35.
[33] R. Doc. No. 28, at 8 ¶ 36.

student."[34]  Dr. Seoane told Shafiq not to pursue the next level of the appeal process to the UQ-OCS Senate Student Appeals Committee ("student appeals committee") because she would lose the appeal, even if she succeeded in her rotations, and he demanded that she tell him whether she intended to pursue an appeal to the student appeals committee.[35]  Shafiq appealed the decision to the student appeals committee on May 15, 2017.[36]  Shafiq also filed a grievance against Dr. Seoane "for using abusive and humiliating speech."[37]

Three days after Shafiq met with Dr. Seoane, Dr. Sean Waldron ("Dr. Waldron") failed Shafiq on her Clinical Participation Assessment ("CPA") for Orthopedics.[38]  Shafiq asked Dr. Waldron for details relating to her failure and, after five days, he responded by telling her that she failed based on her "initiative and engagement," but he would not provide any further details or specifics.[39]  Shafiq then asked Dr. Seoane to provide reasons for the failing grade.  He explained that the failing grade was due to her "nil-minimal participation in clinical activities" and "unsatisfactory attendance."[40]  Dr. Seoane did not respond to Shafiq's follow-up inquiry into her alleged absences.[41]

---

[34] R. Doc. No. 28, at 8 ¶ 37.
[35] R. Doc. No. 28, at 8 ¶ 38.
[36] R. Doc. No. 28, at 8 ¶ 46.
[37] R. Doc. No. 28, at 8 ¶ 40. Shafiq notes that Dr. Seoane used abusive language in their meeting, but he apparently did not include his abusive remarks in the transcript of the meeting. R. Doc. No. 28, at 8 ¶ 39.
[38] R. Doc. No. 28, at 8 ¶ 41.
[39] R. Doc. No. 28, at 8 ¶¶ 42–43.
[40] R. Doc. No. 28, at 9 ¶ 44.
[41] R. Doc. No. 28, at 9 ¶ 44.

Dr. Waldron was required to submit a form that demonstrated Shafiq's failure, but he did not submit that form until he returned from vacation.[42]  Additionally, the form was incomplete, "hastily and haphazardly filled out[,] and submitted mere hours after Dr. Waldron returned from vacation—leaving hardly any time for all of the attending doctors to confer and issue the failing grade, as required by UQ-OCS policy."[43]

The student appeals committee dismissed Shafiq's appeal on August 11, 2017.[44]  Shafiq later learned that Dr. Denton wrote a letter, dated May 23, 2017, to the UQ Faculty of Medicine Academic Administration and Compliance Team Leader that contained misleading statements and characterizations of Shafiq.[45]  Specifically, Dr. Denton suggested that Shafiq misrepresented the positive feedback she received from a doctor during her general practice rotation, and Dr. Denton stated that Shafiq had been rated as only "borderline" and "satisfactory."[46]  The comments Dr. Denton referenced in his letter, however, were from a mid-rotation preliminary assessment while Shafiq was referencing comments from her final assessment.[47]

Dr. Denton added that Shafiq's poor academic performance, specifically, her failure to pass the Step 1 test, would prohibit her from matching to a residency program in the United States.[48]  However, Shafiq had already informed Dr. Denton

[42] R. Doc. No. 28, at 9 ¶ 45.
[43] R. Doc. No. 28, at 9 ¶ 45.
[44] R. Doc. No. 28, at 9 ¶ 47.
[45] R. Doc. No. 28, at 9 ¶ 48.
[46] R. Doc. No. 28, at 9 ¶ 48.
[47] R. Doc. No. 28, at 9 ¶ 48.
[48] R. Doc. No. 28, at 9 ¶ 49.

that she did not intend to pursue a residency program in the United States.[49]  Dr. Denton also failed to mention the extreme circumstances—H.B.'s hospitalization—that surrounded Shafiq's failure in her clinical course.[50]

Shafiq supplemented her appeal to the student appeals committee advising them that she believed that the failure was a deliberate attempt to sabotage her appeal for reenrollment, but her supplement was not considered.[51]

## II.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a district court may dismiss a complaint or part of a complaint when a plaintiff fails to set forth well-pleaded factual allegations that "raise a right to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).  "[A] motion to dismiss under 12(b)(6) is viewed with disfavor and rarely granted." *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013) (internal quotations omitted).  The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547)).

A facially plausible claim is one in which "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  If the well-pleaded factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then "the complaint has

---

[49] R. Doc. No. 28, at 10 ¶ 49.
[50] R. Doc. No. 28, at 10 ¶ 49.
[51] R. Doc. No. 28, at 10 ¶ 50.

alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

The Court will generally not look beyond the factual allegations in the pleadings to determine whether relief should be granted. *See Hicks v. Lingle*, 370 F. App'x 497, 498 (5th Cir. 2010); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In assessing the complaint, however, a court must accept all well-pleaded facts as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Furthermore, "the Court must typically limit itself to the contents of the pleadings, including attachments thereto." *Admins. of the Tulane Educ. Fund v. Biomeasure, Inc.*, 08-5096, 2011 WL 4352299, at *3 (E.D. La. Sept. 6, 2011) (Vance, J.) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). "The Court, however, 'may review the documents attached to the motion to dismiss, *e.g.*, the contract[ ] in issue here, where the complaint refers to the documents and they are central to the claim.'" *Id.* (quoting *Kane Enters. v. MacGregor(USA) Inc.*, 332 F.3d 371, 374 (5th Cir. 2003)). "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)).

### III.

Shafiq sets forth two causes of action in her second amended complaint: (1) breach of contract and (2) breach of the covenant of good faith and fair dealing, both pursuant to Louisiana law. The Court considers each in turn.

## A.

"It is generally held across the jurisdictions of the United States that the basic legal relation between a student and a private university or college is contractual in nature." *Guidry v. Our Lady of the Lake Nurse Anesthesia Program*, 2014-0461, p. 6 (La. App. 1 Cir. 1/29/15); 170 So. 3d 209, 213 (citing *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992)). "The terms of the contract are rarely delineated; however, it is generally accepted that the catalogs, bulletins, circulars, and regulations of the university made available to the student become part of the contract." *Id.* (citations omitted); *see also I.F. v. Admins. of Tulane Educ. Fund*, 2013-0696, p. 9 (La. App. 4 Cir. 12/23/13); 131 So. 3d 491, 498 (citing *Babcock v. New Orleans Baptist Theological Seminary*, 554 So. 2d 90, 96–97 (La. Ct. App. 1989) (holding that the trial court did not "err in holding that school publications given to students were part of the terms of a 'contract' between a school and its students")).

"[I]n order to state a claim for breach of contract, the plaintiff must do more than merely allege that a promise was inadequately performed; a plaintiff must point to an *identifiable contractual promise* that the defendant failed to honor." *Guidry*, 170 So. 3d at 214 (citing *Ross*, 957 F.2d at 417). "Such a claim does not require an inquiry into the nuances of educational processes and theories, but rather, involves an objective assessment of whether the institution made a good faith effort to perform on its promise." *Id.* (citing *Ross*, 957 F.2d at 417 (explaining that in a breach of contract case, "the essence of the plaintiff's complaint would not be that the

institution failed to perform adequately a promised educational service, but rather that it failed to perform the service at all")).

> Nevertheless, courts have declined to apply contract law rigidly in these cases, when doing so would result in overriding a purely academic determination. When courts are asked to review the substance of genuinely academic decisions, they should show great respect for the faculty's professional judgment and should not override that judgment unless it is a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment. Determinations concerning a student's qualifications rest in most cases on the subjective professional judgment of trained educators, who are the best judges of their student's academic performance and his or her ability to master the required curriculum. As such, school authorities have absolute discretion in determining whether a student has been delinquent in [her] studies. This is especially the case regarding degree requirements in the health care field, when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession.
>
> Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking. Notwithstanding the strong public policy of judicial restraint in disputes involving academic standards, the decisions of educators are not completely immune from judicial scrutiny, and courts will intervene if an institution exercises its discretion in an arbitrary or irrational fashion.

*Guidry*, 170 So. 3d at 214–15 (citations omitted).

Shafiq asserts that defendants breached their contract by denying her the rights guaranteed by the Education Services for Overseas Students ("ESOS") Act

2000 and UQ's policies and procedures.[52]  Defendants do not dispute that the ESOS national code and the UQ critical incident management procedures apply to Shafiq and that the parties formed a contract.

Defendants argue, however, that Shafiq has failed to sufficiently plead her claim for breach of contract because she has not shown that UQ-OCS, an academic institution, acted arbitrarily in its academic or disciplinary decisions, namely its decision to expel Shafiq and deny her appeal.[53]  Defendants assert that Shafiq must meet the arbitrary and capricious standard because her "breach of contract claim is inextricably intertwined with Defendants' academic judgment to dismiss her for poor academic performance."[54]  In response, Shafiq maintains that her claims are not based on decisions that rely on defendants' academic or professional judgment but, rather, are based on defendants' failure to uphold their "contractual obligations to provide a case manager and take affirmative action to assist her following a traumatic event, as well as pursue her grievance with stated policies."[55]

Accepting the facts in the second amended complaint as true, the Court does not view Shafiq's breach of contract claim as a challenge to defendants' pure or

---

[52] R. Doc. No. 28, at 11.  The Education Services for Overseas Students ("ESOS") Act 2000 is a "framework [that] protects the rights of international students studying in Australia," and "sets out the standards that Australian institutions must meet in offering education and training services to international students." StudyInAustralia.gov.au, https://www.studyinaustralia.gov.au/english/australian-education/education-system/esos-act.  Defendants attached the ESOS national code provisions, as well as the UQ critical incident management procedures, to the motion to dismiss. *See* R. Doc. Nos. 21-2, 21-3.
[53] R. Doc. No. 21-1, at 8–9.
[54] R. Doc. No. 32, at 3.
[55] R. Doc. No. 26, at 9.

genuine academic decisions that required defendants' professional educational judgment. Similarly, the Court's consideration of Shafiq's breach of contract claim does not require an evaluation of her academic performance. Defendants are not owed a heightened standard with respect to the breach of contract claims asserted herein.

**i.**

Shafiq asserts that the ESOS Act requires that foreign students and universities have a contract that governs their relationship, and that the student must sign or otherwise accept the agreement.[56] Any materials provided to students, such as catalogs, can become part of the agreement.[57] Therefore, Shafiq asserts, defendants contracted with her and agreed to provide her the rights guaranteed by the ESOS Act and other university materials.[58]

The ESOS national code, which Shafiq refers to in her second amended complaint and which defendants attached to their motion, provides for student support services.[59] "The registered provider must have a documented critical incident policy together with procedures that cover[ ] the action to be taken in the event of a critical incident, required follow up to the incident, and records of the incident and action taken."[60] A "critical incident" is defined by the ESOS national code as "a traumatic event, or the threat of such (within or outside Australia), which causes

---

[56] R. Doc. No. 28, at 10 ¶ 53.
[57] R. Doc. No. 28, at 10 ¶ 53.
[58] R. Doc. No. 28, at 11 ¶ 54.
[59] R. Doc. No. 21-2, at 1.
[60] R. Doc. No. 21-2, at 2 (ESOS National Code 6.4).

extreme stress, fear, or injury."[61] Critical incidents, according to the national code, include, but are not limited to, missing students; severe verbal or psychological aggression; death, serious injury, or any threat of these; natural disaster; and issues such as domestic violence, sexual assault, and drug or alcohol abuse.[62] "Non-life threatening events could still qualify as critical incidents."[63]

UQ also provides its own critical incident management procedures on its website, which defendants also attached to their motion to dismiss.[64] UQ defines a "critical incident" as an "adverse incident or series of incidents that have the potential to damage the University's people, operations, environment and its long-term prospects and reputation," and it also incorporates the ESOS national code's definition.[65]

UQ's critical incident management procedures provide for critical incident management ("CIM"), "[t]he process by which the University builds resilience, responds to and recovers from a critical incident," as well as a critical incident management team ("CITM"), which is a "group of staff members responsible for carrying out the functions of planning for and responding to a critical incident."[66]

UQ classifies critical incidents as minor, moderate, and major:[67]

> A minor incident or minor injury has a localized impact on
> staff, students or members of the community and may

---

[61] R. Doc. No. 21-2, at 2 (ESOS National Code 6.4).
[62] R. Doc. No. 21-2, at 2 (ESOS National Code 6.4).
[63] R. Doc. No. 21-2, at 2 (ESOS National Code 6.4).
[64] *See* R. Doc. No. 21-3.
[65] R. Doc. No. 21-3, at 1 (UQ Critical Incident Management Procedures 7.60.01 § 2).
[66] R. Doc. No. 21-3, at 1 (UQ Critical Incident Management Procedures 7.60.01 § 2).
[67] R. Doc. No. 21-3, at 1 (UQ Critical Incident Management Procedures 7.60.01 § 2).

entail minor property damage. The incident has been contained and is unlikely to escalate in severity. It can usually be handled by campus personnel at the organizational unit level using normal operating procedures.

[A moderate event is] an incident or event, which has a localized impact on University operations and may threaten life or property, or could potentially escalate to a major incident. A moderate event might include also, the serious injury or death, of an individual student or staff member. A moderate event may involve the activation of an emergency response, and or [sic] the CIM Team.

[A major event is] an incident or event that has a high impact or imminent severe adverse effect on University operations stemming from events such as explosion, large fire, shooting, material release, pandemic or natural disaster. It may entail or threaten to cause multiple fatalities or serious injuries and/or significant property damage or severe adverse media coverage. It is likely to involve an emergency response from relevant Queensland Emergency Services and would usually necessitate activating the CIM Team.[68]

Based on the facts Shafiq alleges in her second amended complaint, Shafiq could have only suffered a minor critical incident as a result of H.B.'s mental breakdown and hospitalization because she does not allege any impact on University operations or a threat to life or property.

The UQ critical incident management procedure § 4 provides "procedure statements" for each type of event.

In the event of a critical incident affecting one or more members of [the] staff or students that is categorised as minor, and where a CIMT has not been activated, a case

---

[68] R. Doc. No. 21-3, at 1 (UQ Critical Incident Management Procedures 7.60.01 § 2).

> manager will be appointed to undertake the actions as
> outlined in Section 5.[69]

Shafiq asserts that the critical incident policy requires, at a minimum, the appointment of a case manager in the event of a critical incident.[70] Thus, Shafiq alleges that, by failing to provide Shafiq with a case manager following her alleged critical incident in accordance with § 4, defendants breached their contract to abide by these procedures.[71]

The Court cannot at this stage of the litigation conclude that Shafiq was not owed a case manager in the wake of her alleged critical incident. However, the Court questions whether this particular breach of contract claim would survive a motion for summary judgment or trial. Specifically, the Court, reading UQ's critical incident management procedures in full, is skeptical that Shafiq suffered even a minor critical incident as defined by UQ's policies. Further, the Court questions whether Shafiq would have been owed a case manager even if she did suffer a minor critical incident, considering § 4 contemplates the appointment of a case manager to "undertake the actions as outlined in Section 5," which provides for communication with University Security in the wake of an incident involving death, serious injury, or a threat to life.[72] Furthermore, the Court notes that certain UQ polices Shafiq relies on do not make specific mention of who should provide such services, whether it be a case manager or other personnel.

---

[69] R. Doc. No. 21-3, at 2 (UQ Critical Incident Management Procedures 7.60.01 § 4).
[70] R. Doc. No. 28, at 11 ¶ 55; R. Doc. No. 21-1, at 11.
[71] R. Doc. No. 26, at 11–12; *see also* R. Doc. No. 28, at 11–12, ¶ 59.
[72] R. Doc. No. 21-3, at 2 (UQ Critical Incident Management Procedures 7.60.01 § 5).

Nevertheless, the Court finds that Shafiq has alleged facts sufficient to state a plausible claim for relief, and her breach of contract claim as to defendants' breach of their critical incident management procedures survives the Rule 12(b)(6) pleading standard.

### ii.

The Court finds that Shafiq has not pled facts sufficient to establish a claim for breach of contract on the basis that defendants violated UQ's student grievance resolution policies.[73] Shafiq relies only on Dr. Denton's May 23, 2017 letter.

Shafiq asserts that the student grievance resolution policies require faculty to "act fairly and impartially" and "exercise independent judgment at all times about the particular complaint or appeal."[74] Specifically, she asserts that "staff who have 'previously advised' a student in relation to their appeal 'must not be involved in undertaking an investigation or in a decision-making capacity in relation to that student's appeal.'"[75] Shafiq alleges that Dr. Denton, who advised Shafiq regarding the appeals process, violated the procedure by submitting the May 23, 2017 letter, which recommended refusal of enrollment, to the UQ Faculty of Medicine Academic Administration and Compliance Team Leader. Dr. Denton allegedly submitted his letter to the compliance team leader while Shafiq's appeal was pending before the student appeals committee and after Professor Ward had already denied Shafiq's

---

[73] R. Doc. No. 26, at 13.
[74] R. Doc. No. 28, at 12 ¶ 60.
[75] R. Doc. No. 28, at 12 ¶ 60 (quoting Student Grievance Resolution Policy 3.60.02(b) ¶¶ 8.1, 8.3).

appeal. Shafiq alleges that Dr. Denton's letter "likely" factored into the decisions of both Professor Ward and the student appeals committee, but Professor Ward could not have reviewed the letter because the letter is dated after Professor Ward denied Shafiq's appeal.[76]

Shafiq does not allege that Dr. Denton made any decisions as to her appeal—only that his recommendation was improper. Shafiq does not explain who the compliance team leader was, nor does she allege what role, if any, the compliance team leader had with respect to her appeal to the student appeals committee. Furthermore, Shafiq does not allege that the student appeals committee reviewed Dr. Denton's letter at all; she only alleges that it "likely" factored into the student appeals committee's decision. Such conclusory allegations cannot survive defendants' Rule 12(b)(6) challenge.

But regardless of the compliance team leader's role, the submission of Dr. Denton's letter was not a breach of the stated policies. Dr. Denton's letter recommending refusal of enrollment cannot be construed as "undertaking an investigation" or exercising "decision-making capacity" with respect to Shafiq's appeal to the student appeals committee. Therefore, Shafiq has not pled facts that allege any more than the mere possibility of recovery, and her claim that Dr. Denton's letter breached UQ's student grievance resolution policies cannot proceed forward as an independent breach of contract claim.

---

[76] R. Doc. No. 28, at 9 ¶ 48.

The parties should be aware, however, that to the extent the Court has made any specific findings with respect to the pleading of a breach of contract cause of action, Shafiq is not necessarily precluded from attempting to introduce evidence of factual matters that do not, by themselves, amount to an independent cause of action.

**B.**

Shafiq's second cause of action is that defendants breached the implied covenant of good faith and fair dealing. Defendants argue, again, that Shafiq is challenging defendants' academic judgment and that she has not pled facts sufficient to demonstrate arbitrary and capricious conduct. While Louisiana law recognizes the implied covenant of good faith and fair dealing, neither party has identified a case in which a Louisiana court has applied the arbitrary and capricious standard to this particular cause of action.

"Under Louisiana law, 'a party to a contract has an implied obligation to put forth a good faith effort to fulfill the conditions of the contract.'" *Biomeasure*, 2011 WL 4352299, at *6 (quoting *Bloom's Inc. v. Performance Fuels, LLC*, 44, 259, p. 5 (La. App. 2 Cir. 7/1/09); 16 So. 3d 476, 480); *see also Brill v. Catfish Shaks of America, Inc.*, 727 F. Supp. 1035, 1039 (E.D. La. 1989) ("As a general rule, there is an implied covenant of good faith and fair dealing in every contract."). "To state a cause of action for breach of the duty of good faith and fair dealing, 'the plaintiff must allege that the defendant's actions were prompted by fraud, ill will, or sinister motivation.'" *Biomeasure*, 2011 WL 4352299, at *6 (quoting *Commercial Nat'l Bank v. Audubon Meadow P'ship*, 556 So. 2d 1136, 1139 (La. Ct. App. 1990)). "A mere failure to fulfill

an obligation, without a showing of intent or ill will, does not constitute a breach of good faith." *Id.* (citing *Brill*, 727 F. Supp. at 1041).

"The Fifth Circuit, relying on *Bond v. Broadway*, 607 So. 2d 865 (La. Ct. App. 1992), provided the following definition of bad faith:

> [t]he opposite of 'good faith,' generally implying or involving actual or constructive fraud, or a design to mislead and deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive. The term bad faith means more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives."

*Id.* (quoting *Industrias Magromer Cueros y Pieles S.A. v. La. Bayou Furs Inc.*, 293 F.3d 912, 922 (5th Cir. 2002)).

Shafiq alleges that Dr. Denton's letter and Dr. Waldron's failing grade were in retaliation for pursing her appeal. Shafiq's claim is supported by her allegations that Dr. Denton tried to influence the student appeals committee's decision by recommending refusal of enrollment;[77] that Dr. Denton based his recommendation on mischaracterizations of Shafiq's academic record and misrepresentations about her obtaining a residency;[78] that Dr. Seoane "berated" Shafiq about pursing her appeal and told her "that it did not matter if she were successful in later rotations because

---

[77] *See* R. Doc. No. 28, at 13 13–14 ¶¶ 69–70 (citing Student Grievance Resolution Policy 3.60.02(a), ¶ 2, 3.60.02(b), ¶ 3).
[78] R. Doc. No. 28, at 14 ¶ 71.

she was going to lose the appeal;"[79] and that Dr. Waldron failed Shafiq on her CPA but provided little to no reasons for the failing grade.[80]

The Court questions the viability of some of Shafiq's allegations, such as the faculty's obligation to inform Shafiq about her alleged options to withdraw from a course without academic penalty and the faculty's obligation to activate an alleged academic intervention strategy if her academic performance was "poor."[81]  At this stage of the proceedings, however, the Court finds that Shafiq has pled sufficient facts to survive a Rule 12(b)(6) motion and, therefore, defendants' motion to dismiss is denied as to this particular cause of action.

## IV.

Shafiq requests an award of attorney's fees for both of her causes of action.[82] "It is beyond peradventure that, under Louisiana law, attorney's fees are recoverable only if they are authorized by statute or by contract." *Homestead Ins. Co. v. Guar. Mut. Life Co.*, 459 F. App'x 398, 404 (5th Cir. 2012) (citations omitted).  The Fifth Circuit has recognized that a plaintiff urging a breach of contract claim is not necessarily entitled to attorney's fees. *See Homestead*, 459 F. App'x at 404; *see also Sher v. Lafayette Ins. Co.*, 2007-2441, p. 18 (La. 4/8/08); 988 So. 2d 186, 201 (denying an award of attorney's fees for plaintiff's bad faith breach of contract claim).  "A breach of contract action does not fall within one of the limited exceptions to the

---

[79] R. Doc. No. 28, at 8 ¶ 38.
[80] R. Doc. No. 28, at 8–9, ¶¶ 42–45.
[81] R. Doc. No. 28, at 13 ¶ 68, 14 ¶ 73.
[82] R. Doc. No. 28, at 13 ¶ 54, 15 ¶ 80.

general rule; if the parties fail to expressly provide an obligation to pay attorney's fees, the law will not imply one." *Id.* (citing *Maloney v. Oak Builders, Inc.*, 235 So. 2d 386, 390 (La. 1970); *Rutherford v. Impson*, 366 So. 2d 944, 947 (La. Ct. App. 1978)). An award of attorney's fees is strictly construed because it is "exceptional and penal in nature." *Id.* at 405 (citations omitted).

Defendants move to dismiss Shafiq's claim for attorney's fees because she has not alleged a statutory or contractual basis for their recovery. Shafiq, however, asks the Court to allow her more time to determine, through discovery, whether there is any contractual basis for the recovery of attorney's fees in this matter.[83] It is clear that Shafiq does not have a statutory basis for attorney's fees, and Shafiq has not alleged a contractual basis for attorney's fees in her second amended complaint. Therefore, Shafiq's claim for attorney's fees must be dismissed pursuant to Rule 12(b)(6).

## V.

In her reply, Shafiq requests leave to amend her complaint in the event the Court grants any part of defendants' motion to dismiss.[84] The Court declines Shafiq's request to amend her complaint.

"The Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Although Rule 15(a)(2) provides a "general standard" by which courts should assess motions to amend pleadings, such a standard is "tempered by the necessary

---

[83] R. Doc. No. 26, at 17.
[84] R. Doc. No. 26.

power of a district court to manage a case." *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003). "Denial of leave to amend may be warranted for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of a proposed amendment." *United States v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010).

The same day that Shafiq filed her response to defendants' motion to dismiss, wherein she requested leave to amend her complaint in the event the Court grants any portion of defendants' motion to dismiss, Shafiq filed a separate motion for leave to amend her first amended complaint "to supplement additional factual details not included in the First Amended Complaint."[85] The Court granted the unopposed motion.[86] Defendants then filed their reply memorandum asserting that the second amended complaint did not cure the issues raised in defendants' motion to dismiss her first amended complaint.[87]

Considering that Shafiq had notice of the first amended complaint's potential deficiencies through the motion to dismiss, that she was permitted to amend the first amended complaint to add factual allegations, and that she failed to provide any reasons or evidence supporting her request to amend, "the Court will not entertain a blanket request to amend the [second amended] complaint in the absence of showing

---

[85] R. Doc. No. 25, at 2.
[86] R. Doc. No. 26.
[87] R. Doc. No. 32.

some evidence that an amendment would not be futile." *Verrett v. Louisiana*, No. 13-188, 2013 WL 3874730, at * 3 (M.D. La. July 25, 2013) (Brady, J).

## VI.

Accordingly,

**IT IS ORDERED** that the motion to dismiss is **GRANTED IN PART** and **DENIED IN PART** as stated fully herein.

**IT IS FURTHER ORDERED** that the motion to dismiss Aishah Shafiq's claim for attorney's fees is **GRANTED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Aishah Shafiq's request for leave to amend her complaint in the event the Court grants any part of defendants' motion to dismiss is **DENIED**.

New Orleans, Louisiana, March 13, 2019.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**